1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASA ENTERPRISE, INC., et al., | Case No. 1:21-cv-00915-BAK |
| Plaintiffs, | ORDER RE: INFORMAL DISCOVERY DISPUTE RULING IN FAVOR OF DEFENDANT AND DENYING PLAINTIFFS' REQUESTS FOR DISCOVERY |
| v. | |
| STAN BOYETT & SON, INC., | (ECF Nos. 31, 34, 35, 36) |
| Defendant. | |

Currently before the Court is a discovery dispute that the parties have agreed to submit to the Court for adjudication through the Court's informal discovery dispute procedure.

## I.

## BACKGROUND

### A.    Procedural Background

On June 9, 2021, Plaintiffs ASA Enterprise, Inc. ("ASA"), and Manjit Singh ("Singh"), filed this action against Defendant Stan Boyett & Son, Inc. ("Boyett").  (ECF No. 1.)  The action was initially assigned to then Magistrate Judge Jennifer L. Thurston.  On September 9, 2021, a scheduling order issued, setting among other deadlines, a nonexpert discovery deadline of May 31, 2022.  (ECF No. 18.)  The scheduling order specified that "[n]on-dispositive motions related

1

to non-expert discovery SHALL be filed within a reasonable time of discovery of the dispute, but in [sic] not later than 30 days after the expiration of the non-expert discovery deadline."  (ECF No. 18 at 4 n.2.)  Consent forms were returned by the parties, and on September 21, 2021, this action was authorized to proceed before the United States Magistrate Judge for all purposes, pursuant to 28 U.S.C. § 636(c)(1).  (ECF Nos. 19, 20, 21.)

On January 6, 2022, this action was temporarily referred to Magistrate Judge Stanley A. Boone.  (ECF No. 24.)  On January 28, 2022, the parties submitted a joint mid-discovery status report indicating there were no discovery issues, and that the parties still needed to issue written discovery requests.  (ECF No. 25.)  In light of the filing, the Court vacated the mid-discovery status conference that was set for February 4, 2022.  (ECF No. 27.)

On June 30, 2022, at the parties' request, the Court set an informal discovery dispute conference for July 12, 2022.  (ECF No. 29.)  On July 7, 2022, Defendant's new counsel substituted in.  (ECF No. 33.)  On August 8, 2022, the parties filed a joint statement re discovery dispute ("JS").  (ECF No. 34.)  On August 9, 2022, the Court held a discovery dispute conference via video conference.  (ECF No. 35.)  Megan Childress appeared on behalf of Plaintiffs.  Alissa Pleau-Fuller appeared on behalf of the Defendant.  (Id.)  The Court ordered supplemental briefing in light of the issues discussed at the conference, and ordered the parties to highlight respective portions of the contract for the Court.  (Id.)  On August 19, 2022, the parties filed a supplemental joint statement regarding the discovery dispute ("SJS").  (ECF No. 36.)[1]

**B.      Summary of the Case and Certain Proffered Legal Standards**

The parties provided a summary of the case in the joint statement, which the Court will reproduce here for purposes of the instant discovery dispute.  The summary includes reference to caselaw pertaining to petroleum industry franchises.

Plaintiffs own and operate a gas station and convenience store in Bakersfield.  Plaintiffs and Boyett were parties to a 76 Branded License and Sales Agreement (the "Franchise Agreement"), pursuant to which Plaintiffs agreed that the gas station (not the convenience store)

---

[1]  Due to technical issues or otherwise, the parties failed to highlight their respective portions in both the electronic and hard copies of the supplemental briefing provided to the Court, despite specifying that they did so in briefing.

would be branded 76, and that Plaintiffs would purchase and accept from Boyett, minimum quantities of 76-branded gasoline.  The 76 brand is owned by Phillips 66 Company ("P66"). Boyett is what is known in the retail petroleum industry as a "jobber," which is a middleman between refining companies and fuel retailers (gas stations).  Boyett and P66 are parties to a Trademark License Agreement.  Under that Trademark License Agreement, P66 has granted Boyett the authority to enter into sub-license agreements (franchise agreements) with gas stations and requires Boyett to enforce P66's trademark and image standards at any gas station branded 76 through a wholesale marketing agreement with Boyett.  The Franchise Agreement between Plaintiffs and Boyett required Plaintiffs to maintain the 76-branded gas station according to minimum imaging standards set by P66.

The franchise relationship between Plaintiffs and Boyett is governed by the Petroleum Marketing Practices Act, 15 U.S.C. 2801, *et seq.* ("PMPA").  The PMPA was enacted in 1978 to protect "franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises."  S. Rep.No.95-731, 95th Cong.2d Sess., 15-19 (1978), reprinted in [1978] U.S. Code Cong. & Admin. News 874 ("Senate Report"); DuFresne's Auto Serv., Inc. v. Shell Oil Co., 992 F.2d 920, 925 (9th Cir. 1993) (the PMPA is "intended to protect gas station franchise owners from arbitrary termination or nonrenewal of their franchises with large oil corporations and gasoline distributors.").  "[T]he centerpiece of the Act lies in its prohibition against a franchisor terminating or refusing to renew a franchise, except for the reasons specified in the Act, see, 15 U.S.C. § 2802, and in the stringent notice requirements it imposes on a terminating or nonrenewing franchisor, see, 15 U.S.C. § 2804.  The Act, then, is directed first and foremost at the permissible grounds for termination or nonrenewal of franchises and at the manner in which such termination or nonrenewal is effectuated, or, in other words, at the why and how of ending a franchise."  Lasko v. Consumers Petroleum of Conn., Inc., 547 F.Supp. 211, 216 (D. Conn. 1981) ("Lasko").

Here, Boyett terminated Plaintiffs' franchise after Plaintiffs failed two (2) consecutive "mystery shop" inspections and failed to cure by achieving a passing scores on the third consecutive "mystery shop" inspection.  Plaintiffs contend, among other things, that the PMPA

1  does not permit Boyett to terminate a franchise based solely on a franchisee's purported failure to

2  comply with arbitrary, subjective and draconian "mystery shopper" inspections.

3  **C.      The Discovery Dispute**

4  The parties proffer there are two categories of information that Plaintiffs seek discovery

5  related to, and that Defendant contends are not discoverable.  First, Plaintiffs request Defendant

6  produce the Trademark License Agreement and whole marketing agreement and addendums

7  thereto, between Defendant Boyett and P66.  Second, Plaintiffs request Defendant to identify all

8  other franchisees of Defendant's who have received notices of default or termination for failed

9  image standards.

10  **II.**

11  **GENERAL LEGAL STANDARDS FOR DISCOVERY DISPUTE PROCESS**

12  The Court is vested with broad discretion to manage discovery.  Dichter-Mad Family

13  Partners, LLP v. U.S., 709 F.3d 749, 751 (9th Cir. 2013) (per curiam); Surfvivor Media, Inc. v.

14  Survivor Prods., 406 F.3d 625, 635 (9th Cir. 2005); Hallett v. Morgan, 296 F.3d 732, 751 (9th

15  Cir. 2002).  Pursuant to the undersigned's procedures for informal discovery dispute resolution,

16  the parties may stipulate to allow for the resolution of discovery disputes outside of the formal

17  Local Rule 251 procedures, by conducting an informal conference.  Prior to conducting such

18  conference, the parties must agree to the informal process, agree to an entry of an order by the

19  Court after the conference, and agree to abide by such order.

20  Rule 26 provides that a party "may obtain discovery regarding any nonprivileged matter

21  that is relevant to any party's claim or defense and proportional to the needs of the case,

22  considering the importance of the issues at stake in the action, the amount in controversy, the

23  parties' relative access to relevant information, the parties' resources, the importance of the

24  discovery in resolving the issues, and whether the burden or expense of the proposed discovery

25  outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  Information need not be admissible in

26  evidence to be discoverable.  Id.  "Evidence is relevant if: (a) it has any tendency to make a fact

27  more or less probable than it would be without the evidence; and (b) the fact is of consequence in

28  determining the action."  Fed. R. Evid. 401.

4

Relevancy is broadly defined to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). Although relevance is broadly defined, it does have "ultimate and necessary boundaries." Gonzales v. Google, Inc., 234 F.R.D. 674, 680 (N.D. Cal. 2006) (quoting Oppenheimer Fund, Inc., 437 U.S. at 351). While discovery should not be unnecessarily restricted, discovery is more limited to protect third parties from harassment, inconvenience, or disclosure of confidential documents. Dart Industries Co., Inc. v. Westwood Chemical Co., Inc., 649 F.2d 646, 649 (9th Cir. 1980). In deciding discovery disputes, courts must be careful not to deprive the party of discovery that is reasonably necessary to their case. Dart Industries, 649 F.2d at 680. Pursuant to Rule 26(c)(1), the Court may, for good cause, issue a protective order forbidding or limiting discovery. The avoidance of annoyance, embarrassment, oppression, or undue burden or expense are grounds for the issuance of a protective order. Fed. R. Civ. P. 26(c).

## III.

## DISCUSSION

The Court first addresses the preliminary issue of timeliness of the instant discovery dispute in relation to the scheduling order, before proceeding into the two substantive areas of discovery that the parties' briefing focuses on.

### A.   Timeliness

1.   Plaintiffs' Position

Plaintiffs served the relevant requests for production ("RFP") and interrogatories on February 1, 2022, and Defendant requested an extension beyond the thirty (30) day deadline to respond. Defendant, with its responses, produced a privilege log that identified the Trademark License Agreement as a responsive document being withheld on privilege grounds. (SJS at 1.) Plaintiffs proffer that prior to the May 31 discovery cutoff, Plaintiff initiated the meet and confer process with Defendant by sending a letter taking certain issues regarding the various responses, and taking issue with Defendant's withholding of the Trademark License Agreement. Plaintiffs state Defendant, for the first time now takes the position that the Trademark License Agreement

1   was not responsive to any of Plaintiff's requests, and also emphasize Defendant never raised this

2   argument in its previous brief, or at the informal discovery conference on August 9, 2022.  (SJS at

3   1 n.1.)

4          Noting the scheduling order issued by the previous Magistrate Judge assigned to this

5   action specified the deadline for filing of any non-expert discovery motion was June 30, 2022,

6   Plaintiff states the parties were still meeting and conferring regarding the discovery responses as

7   of June 8, 2022, when Defendant's prior counsel sent an email to Plaintiff's counsel agreeing that

8   the motion to compel deadline "won't expire for 30 days after (if) the parties reach an impasse –

9   where you [sic] ASA is still demanding further written responses and/or documents and Boyett

10  has represented that it will not provide any further written responses or documents."  (SJS at 1.)

11  Plaintiff proffers this shows an agreement to extend the nonexpert discovery motion to compel

12  deadline, and demonstrates that as of June 8, 2022, it was not evident to Plaintiffs that Defendant

13  would not provide the information at issue in this discovery dispute.   On June 22, 2022,

14  Defendant agreed to provide supplemental responses to some of the discovery items previously in

15  dispute, but for the first time, made clear they would not produce the Trademark License

16  Agreement or the information concerning the other franchisees at issue.   Notwithstanding the

17  proffered agreement to extend the discovery deadline, Plaintiffs states they informed Defendant

18  they intended to file the motion to compel on or before the June 30 deadline.

19         On June 28, 2022, the parties met and conferred regarding the Court's informal discovery

20  dispute procedures.   Plaintiffs submit the parties agreed to the process in lieu of the motion

21  process, and given scheduling, the parties agreed that if the process was initiated on or before

22  June 30, the motion cutoff deadline would be complied with.  (SJS at 2.)  The parties agreed to

23  contact the courtroom deputy by June 30, and did so to schedule the informal conference for July

24  12, 2022.  On July 6, 2022, Defendant informed Plaintiffs that new counsel was substituting in,

25  and on July 7, 2022, the informal conference was continued to August 9, 2022, to accommodate

26  new counsel.  (SJS at 2.)

27         2.      Defendant's Position

28         Defendant, represented by new counsel, does not dispute that the parties "apparently

agreed" to extend the deadline to file a motion to compel, and agreed to extend the date of the informal conference.  (SJS at 3.)  Defendant argues nonetheless that Plaintiff delayed finally moving to compel regarding issues that substantially expand the case until after the nonexpert discovery deadline, regardless of the motion to compel deadline, as the scheduling order states that such motions "SHALL be filed within a reasonable time of discovery of the dispute."  (ECF No. 18 at 2.)  Defendant suggests Plaintiffs waited until after the discovery cutoff and delayed presenting this issue to the Court until the final day they could do so on discovery served in February of 2022, and that had responses served March 17, 2022. (SJS at 4.)  Defendant proffers it objected at that time to the requests as to other franchisees or the Licensing Agreement, (RFP 1-10, 14-17, 22-26), and proffers that no request or interrogatory specifically sought the Licensing Agreement.  Defendant states that as Plaintiff conceded at the original conference, Defendant has consistently taken the position it will not produce the Licensing Agreement or related agreements, or respond to or produce documents related to other franchisees' notices of default or their termination or related reports.  Despite never changing this position, Plaintiffs instead waited until June 30, 2022.

Defendants further highlight that Plaintiffs are now seeking extensive information about other franchisees, and as previously briefed, this information is irrelevant, and the privacy of the other franchisees precludes such discovery.  Defendant argues expanding the scope of discovery now to focus on other sites would inappropriately expand the scope of discovery in this case after the cut-off date, potentially prejudice Defendant, and may open the need for Defendant to then conduct discovery on these other businesses.

3.    The Court's Ruling

The scheduling order specifies that: "Non-dispositive motions related to non-expert discovery SHALL be filed within a reasonable time of discovery of the dispute, but in [sic] not later than 30 days after the expiration of the non-expert discovery deadline." (ECF No. 18 at 4 n.2.)  The Court does agree with Defendant that the spirit of the language in the scheduling order directs the parties to file a discovery motion within a reasonable amount of time of discovery of the issue, and that the June 30, 2022 deadline is meant to be the outer limit for filing discovery

motions that should relate to discovery requests made near the expiration of the nonexpert discovery deadline, which would allow for such reasonable amount of time after discovery of the issue even after the expiration of the discovery deadline and for the filing of such motion within thirty (30) days after the expiration of the nonexpert discovery deadline.

However, despite the language of the scheduling order, the Court finds Plaintiffs have made a sufficient enough showing that they were diligent and met and conferred in good faith on the belief that these issues were allowed to be preserved, and were being preserved, during the meet and confer process between the parties, and before current defense counsel entered into this action. The Court does acknowledge that given the potential massive enlargement of the scope of discovery if it extended out into other franchisees, it surely would have been more prudent for Plaintiffs to develop and present these issues earlier in the discovery process, particularly given there may have been lack of express communication concerning the extent of the preservation of the precise issues. Nonetheless, the Court finds the issues sufficiently preserved for the Court to adjudicate the substantive issues underlying the discovery dispute.

It is in the spirt of the Court's informal discovery dispute process to encourage the parties to extend their meet and confer efforts when possible to resolve such disputes or to narrow such disputes prior to the informal conference. While the parties waited until the last agreed upon date to present these issues for informal resolution, the Court finds Plaintiffs were reasonably diligent and maintained sufficient communication with Defendant in order to bring this dispute for informal resolution.

The Court now proceeds to consider the first substantive issue presented.

**B.      Identified Issue 1: Trademark License Agreement(s) and Addendums**

1.      <u>Plaintiffs' Position</u>

Plaintiffs contend the information sought is not a trade secret and proffer the documents produced by Defendant indicate the franchise termination was based on P66 determining Plaintiffs' mystery shop scores caused Defendant to breach the Trademark License Agreement between Defendant and P66. (JS at 2.) Plaintiffs emphasize Defendant has taken the position that it does not have a mystery shopper inspection program, but rather, was required to implement

and enforce such program pursuant to its Trademark License Agreement with P66.  Plaintiffs submit the Trademark License Agreements and related documents are directly relevant to the claims and defenses in this action.  Plaintiffs state they are entitled to know what the Trademark License Agreement says, as for instance, the notice of termination states the termination was due to the failure to pass three consecutive mystery shop inspections, however, argue that nowhere in the Franchise Agreement, nor the statutorily required franchise disclosure statement, or the imaging standard materials produced in discovery, does it state that "three failed mystery shopper inspections would be considered by Boyett to be a terminable offense."  (JS at 2.)  Plaintiffs ponder if it states this in the Trademark License Agreement, or whether it was an arbitrary rule conjured up by P66 and/or Defendant after the Franchise Agreement was entered into, without otherwise putting Plaintiffs on notice.

### a.    Plaintiffs' Supplemental Briefing Re Franchise Agreement Language

Plaintiffs state they attached a copy of the Franchise Agreement and highlighted the pertinent clause on page 8 for the Court, but they did not do so.  (SJS 2.)[2]  Plaintiffs proffer the clause is the only mention in the Franchise Agreement concerning a mystery shopper program; that the Franchise Agreement does not state Plaintiffs would be terminated for failing to meet mystery shopper standards; and rather, the Franchise Agreement provides that if Plaintiffs received a substandard score and failed to correct, Defendant may correct the violation itself at Plaintiffs' expense.  (SJS 2.)  Plaintiffs emphasize Defendants have not pointed to any document or provision that informed Plaintiffs that three (or any number) of failed mystery shop inspections would result in a termination of the franchise; and while Defendant attached the "imaging standards" that Plaintiffs were required to comply with (Ex. F), the mystery shop program is not mentioned in those documents.  (SJS 2.)

As for Defendants' highlighting of the language in the Franchise Agreement stating that the disclosure required by California Corporations Code § 31100 *et seq.*, was provided to the franchisee, the Code requires the franchisor to include in the disclosure statement, "[a] statement

---

[2]  As noted above, the parties did not actually highlight the relevant terms as they were ordered.  Nonetheless, the Court believes it has located the portions of the Franchise Agreement that the parties reference in their arguments.

1   of the conditions under which the franchise agreement may be terminated or renewal refused, or

2   repurchased at the option of the franchisor."  Cal. Corp. Code § 31101 (c)(2)(H).  The disclosure

3   statement was attached as Exhibit B to the Franchise Agreement, and Plaintiffs submit that

4   nowhere in that document does it inform Plaintiffs that their franchise would be terminated for

5   failing mystery shop inspections, and if passing such were a material term of the Franchise

6   Agreement, it would have had to have been included in the franchise disclosure statement.  (SJS

7   at 3.)  Finally, Plaintiffs state that just because Defendant identified a term as material in the

8   Franchise Agreement does not make it so, and under the PMPA, Defendant has the burden to

9   prove to the trier of fact that the term is material and that the termination was in good faith and in

10   in the normal course of business.  (SJS at 3.)

11          **b.**      **Plaintiffs' Supplemental Briefing Re Evidence of Relevance of Trademark**
                       **License Agreement**
12

13          Plaintiffs have attached a letter from P66 to Defendant, dated January 18, 2021, informing

14   Defendant that Defendant's right to use the 76 trademark at Plaintiffs' station under the

15   Trademark License Agreement between Defendant and P66, was being terminated for Plaintiffs

16   purportedly failing two mystery shops.  (Ex. B, ECF No. 36-1 at 51.)  The letter specifies that the

17   substandard shops were a failure to comply with the requirements of the Trademark License

18   Agreement between Defendant and P66.  Plaintiffs again emphasize Defendant has taken the

19   position that it does not have its own mystery shopper inspection program, and directs the Court

20   to Defendant's responses to interrogatories Nos. 1 to 3 (Ex. C, ECF No. 36-1 at 71-72), and

21   responses to production Nos. 1, 2, 6-13, 20, and 21 ( Ex. D, ECF No. 36-1 at 83-84.  Plaintiffs

22   argue that rather, Defendant was required to implement and enforce said program pursuant to its

23   Trademark License Agreement with P66.  (SJS at 3.)  Therefore, Plaintiffs submit that the

24   Trademark License Agreement and related documents are highly relevant, and they are entitled to

25   know what the agreement says and are not required to accept Defendant's representations.

26          2.      Defendant's Position

27          Defendant counters that the Trademark License Agreement is: (1) proprietary,

28   confidential, and a trade secret; (2) is subject to a confidentiality requirement; and (3) is not the

1   franchise agreement at issue in the litigation, nor relevant to the claims and defenses.  (JS at 3.)

2   Defendant proffers courts typically apply a three part approach in regards to trade secrets:

3   (1) first, "the party opposing discovery must show that the information is a 'trade secret or other

4   confidential research, development, or commercial information' . . . and that its disclosure would

5   be harmful to the party's interest in the property"; (2) second, once met, "[t]he burden then shifts

6   to the party seeking discovery to show that the information is relevant to the subject matter of the

7   lawsuit and is necessary to prepare the case for trial"; and (3) if relevance and necessity are

8   shown, "the court must weigh the injury that disclosure might cause to the property against the

9   moving party's need for the information."   Nat'l Acad. of Recording Arts & Scis., Inc. v. On

10  Point Events, LP, 256 F.R.D. 678, 681–82 (C.D. Cal. 2009) (citing In re Remington Arms Co.,

11  Inc., 952 F.2d 1029, 1032 (8th Cir. 1991)).  "If the party seeking discovery fails to show both the

12  relevance of the requested information and the need for the material in developing its case, there

13  is no reason for the discovery request to be granted, and the trade secrets are not to be revealed."

14  Id.

15  Defendant argues Plaintiffs cannot make this showing because the Trademark License

16  Agreement between Defendant and P66 is not relevant to this case, and it is certainly not

17  necessary to prepare for trial, because this action involves the franchise relationship between

18  Plaintiff and Defendant, and Plaintiffs' failure to meet certain requirements under its agreement

19  with Defendant.  (JS at 3.)  As to what the Franchise Agreement advises Plaintiff of, Defendant

20  contends it clearly articulates Plaintiffs' obligations regarding compliance with P66's brand

21  standards; that such programs are common in the petroleum industry; that P66's brand standards

22  and information regarding mystery shop and image criteria are available to the dealers at any time

23  through direct access to a P66 website portal that provides updated, detailed information

24  regarding the Mystery Shop and Image Criteria program; and further, the expectations, grading,

25  and scores, were clearly provided to the dealers, and therefore the Franchise Agreement between

26  Plaintiffs and Defendant is the relevant agreement here, whereas the Trademark License

27  Agreement with P66 is not relevant or necessary to prepare for trial.  (JS at 3.)  Defendant

28  submits that under the Rule 26 balancing test, Plaintiffs should be precluded from obtaining the

discovery as the information sought is not relevant and the likely negative impact of the discovery into this confidential information far outweighs any alleged benefit.

### a.      Supplemental Briefing from Defendant on Issue of Franchise Agreement Language

Defendant responds that, as indicated in initial briefing, the Franchise Agreement sets forth the requirements of the mystery shopper program, and states the failure to comply is a material breach.  (Franchise Agreement, § 7(b)(ix).)  Defendant proffers the Franchise Agreement states the failure to comply with the P66 mystery shop program is a default of the Franchise Agreement, and permits Defendant to terminate the franchise on that basis.   (Franchise Agreement, §§ 19(b)(iii)(1) and 19(b)(iii)(2).)    Defendant again emphasizes P66's brand standards and information regarding the Mystery Shop and Image Criteria were always available at anytime through the P66 online portal, and Defendant has attached images of the types of information commonly provided.  (Exs. F & I, ECF No. 36-1 at 153-165, 176-231.)  Defendant therefore contends there is no need to consult the Trademark Licensing Agreement, as it does not specify such criteria.  Rather, all dealers, including Plaintiffs, had access to the specific branding requirements and mystery shop criteria; and the Trademark Licensing Agreement between Defendant and P66 provides no further relevant information for Plaintiffs as to the standards requirement and the mystery shops that was not already available to Plaintiffs.  (SJS at 5.)

As for the franchise disclosure statement, Defendant states that it disagrees with Plaintiffs and that it believes it fulfilled all disclosure requirements, and argues that the contents however are not relevant to the discovery dispute here, and the arguments should be disregarded.  (SJS at 5.)

### b.      Supplemental Briefing from Defendant on Issue of Relevance

Defendants reiterate that Plaintiffs cannot meet the requirements of the above balancing test.  See Nat'l Acad. of Recording Arts & Scis., 256 F.R.D. at 681-82.  Defendant also directs the Court to Zenith Radio, wherein the court collected cases regarding protective orders under then Rule 26(c)(7), which is now Rule 26(c)(1)(G).  Zenith Radio Corp. v. Matsushita Elec.

Indus. Co., 529 F. Supp. 866, 890 n.42 (E.D. Pa. 1981).[3]   Defendant argues it treats the Trademark License Agreement and related agreements with P66 as highly confidential and as a trade secret.  (Ex. G, Decl. Ken Berns Supp. Suppl. Br. ("Berns Decl."), ECF No. 36-1 at 166.) Defendant proffers it does not disclose these items to third parties; takes substantial measures to prevent disclosure; and disclosure would provide dealers with an unfair advantage in negotiating future fuel supply agreements with Defendant.  (Id.; SJS at 5-6.)[4]

Defendant submits that once the information is shown to be confidential, the burden then shifts to Plaintiff to show the information is both relevant and necessary, as well as that the need for the information outweighs the injury disclosure might cause.  In re Remington Arms Co., Inc., 952 F.2d at 1032 (8th Cir. 1991); see also Dobson v. Twin City Fire Ins. Co., 2011 WL 6288103, at *4 (C.D. Cal. Dec. 14, 2011).   Defendant again emphasizes the Trademark Licensing Agreement is not relevant nor necessary, and the Notice produced by Plaintiffs does not change the fact that P66 is not a party; that Defendant terminated the franchise for failing to comply with the inspection requirements set forth in the Franchise Agreement; and details about the Mystery Shop and Image Criteria were provided in the BizLink portal to Plaintiffs and dealers.  (SJS at 6.)

As for Plaintiffs' argument that the Licensing Agreement will provide information as to the termination, Defendant contends the argument fails as: (1) Plaintiffs are suing Defendant over claims governed by terms of the Franchise Agreement; and (2) even if the Licensing Agreement was minimally relevant, Plaintiffs do not need the Licensing Agreement as all relevant brand and image standards are available via the portal, and thus not necessary for trial.  Defendant also argues the potential injury to Defendant and/or P66 outweighs any purported need for the information, and disclosure would severely prejudice them.

---

[3]  But see In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig., 101 F.R.D. 34, 43 (C.D. Cal. 1984) ("The defendants, relying upon Zenith, supra, 529 F.Supp. at 875, 894, would have this court place on the movants the burden of showing that confidentiality interests do not overcome access interests.  This I decline to do.").

[4]  Of note, Defendant specifically proffers that here, Plaintiffs' counsel routinely represents may petroleum dealers throughout California, including dealers who have litigated against Boyett in several prior matters, and allowing Plaintiffs or their counsel to obtain this information would be akin to revealing this highly confidential information to the dealer community at large, and put Boyett at a strategic disadvantage with future franchise agreements, for example, by revealing what Boyett pays for fuel, as well as other terms that would allow for  calculation of profit margins.  (Bern Decl. ¶¶ 7-8.)

1

### 3.     The Court's Ruling

"There is no absolute privilege for trade secrets and similar confidential information." U.S. Interloc Matting, Inc. v. Macro Plastics, Inc., No. 2:17-CV-0733 JAM DB, 2017 WL 9565569, at *1 (E.D. Cal. Nov. 14, 2017) (quoting DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 459 (C.D. Cal. 2002); see also MDK, Inc. v. Mike's Train House, Inc., 27 F.3d 116, 120 (4th Cir. 1994) ("[T]rade secrets have widely been held to be discoverable upon appropriate findings and with an appropriate protective order"). "Although there is no absolute privilege for highly confidential information, . . . such information, even if not privileged, may be protected under Rule 26(c)(1)(G)." Nat'l Acad. of Recording Arts & Scis., 256 F.R.D. at 681 (citing In re Remington Arms, 952 F.2d at 1032). "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: . . . (G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G).

Defendant has proffered the appropriate analysis regarding this disputed production is: (1) first, Defendant must show the information is a trade secret or other confidential research, development, or commercial information  and disclosure would be harmful; (2) then, the burden shifts to Plaintiffs to show the information is relevant and necessary to prepare the case for trial; and (3) if relevance and necessity are shown, the court must weigh the injury that disclosure might cause against the Plaintiffs' need for the information.  Nat'l Acad. of Recording Arts & Scis., 256 F.R.D. at 681–82.  The Court accepts this is an appropriate standard, and Plaintiffs do not proffer a different one.  See Hartley Pen Co. v. U.S. Dist. Ct., 287 F.2d 324, 331 (9th Cir. 1961) ("We believe that the requirements of relevance and necessity must be established where disclosure of a trade secret is sought . . . and that the burden rests upon the party seeking disclosure to establish that the trade secret sought is relevant and necessary to the prosecution or defense of the case."); Upjohn Co. v. Hygieia Biological Lab'ys, 151 F.R.D. 355, 358 (E.D. Cal. 1993) ("In order to resist discovery of a trade secret, a party must first demonstrate by competent evidence that the information sought through discovery is a trade secret and that disclosure of the

secret might be harmful [and] [i]f this showing is made, 'the burden shifts to the party seeking discovery to establish that the disclosure of trade secrets is relevant and necessary to the action.' ") (citations omitted); Albee v. Cont'l Tire N. Am., Inc., No. CIVS091145LKKEFB, 2010 WL 1729092, at *9 (E.D. Cal. Apr. 27, 2010); U.S. Interloc Matting, Inc. v. Macro Plastics, Inc., No. 2:17-CV-0733 JAM DB, 2017 WL 9565569, at *1 (E.D. Cal. Nov. 14, 2017) (citing In re Remington Arms Co., Inc., 952 F.2d at 1032); MedImpact Healthcare Sys., Inc. v. IQVIA Inc., No. 19-CV-1865-GPC (DEB), 2021 WL 5605209, at *1 (S.D. Cal. June 29, 2021) (same); but see In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig., 101 F.R.D. 34, 43 (C.D. Cal. 1984) ("The defendants, relying upon Zenith, supra, 529 F.Supp. at 875, 894, would have this court place on the movants the burden of showing that confidentiality interests do not overcome access interests.  This I decline to do.").

"The Ninth Circuit has adopted the definition of 'trade secrets' set forth in the Restatement of Torts, holding that '[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' "  Fed. Trade Comm'n v. Qualcomm Inc., No. 17-CV-00220-LHK, 2019 WL 95922, at *2 (N.D. Cal. Jan. 3, 2019) (quoting Clark v. Bunker, 453 F.2d 1006, 1009 (9th Cir. 1972)).  "Generally [a trade secret] relates to the production of goods.... It may, however, relate to the sale of goods or to other operations in the business."  Id.

Defendant submits it treats the Trademark License Agreement and related agreements with P66 as highly confidential and as a trade secret; that it does not disclose these items to third parties; that it takes substantial measures to prevent disclosure; and that disclosure would provide dealers with an unfair advantage in negotiating future fuel supply agreements with Defendant. (See Berns Decl. ¶¶ 4-9.)  The Court finds Defendant has established the information is a trade secret or other confidential research, development, or commercial information, and that disclosure would be harmful.  The Court now turns to determine whether Plaintiffs have established the requested information is both relevant, and necessary for trial.

While the parties provided general caselaw above pertaining to the PMPA, and Defendant

provided general caselaw pertaining to trade secrets and confidentiality, the parties provided no caselaw to the Court that deals with any of the specific issues involved, such as the significance of franchise agreement terms of contracts between parties in an actual action, and potential relevance and discoverability of confidential agreements between a party and a non-party that have some relationship to the contract between the parties.   The parties provided no caselaw pertaining to franchise agreements and secret shopper programs, nor caselaw pertaining to discovery generally in cases involving the PMPA.

Neither side provided caselaw regarding the proffer by Plaintiffs in the briefing that the decision to terminate the franchise must be in good faith and in the normal course of business, the good faith analysis, and what impact that may have as to the relevancy of contracts between those that are not actually parties to the underlying court action.  Plaintiffs emphasized the good faith and normal course of business standard at the conference.  Once in the initial briefing, Plaintiffs states: "[t]he consequences (or lack thereof) to other franchisees for not passing the mystery shop inspections goes to the issue of whether the terms of the franchise relationship between Boyett and Plaintiffs that Boyett claims were breached were actually material, as well as to the issue of whether Boyett's decision to terminate Plaintiffs' franchise was done in good faith and in the normal course of business."  (JS at 3.)  In the supplemental statement, Plaintiffs again state "[u]nder the PMPA, *Boyett has the burden* to prove to the trier of fact that the term is material and that the termination was in good faith and the normal course of business."  (SJS at 3.)

Plaintiffs cited no section of the PMPA or caselaw supporting this proposition, nor what that analysis would require in relation to the discovery needs.  It is true that "[t]he PMPA is intended to protect gas station franchise owners from arbitrary termination or nonrenewal of their franchises with large oil corporations and gasoline distributors, and to remedy the disparity in bargaining power between parties to gasoline franchise contracts."  BP W. Coast Prod. LLC v. May, 447 F.3d 658, 662 (9th Cir. 2006) (quoting DuFresne's, 992 F.2d at 925).  "One specific purpose of the PMPA is to protect a franchisee who has built up substantial goodwill in a station from having the franchise arbitrarily taken."  Id.  However, the Court's review of the PMPA and caselaw does not indicate that the termination here would be subject to the good faith and normal

course of business standard.

The parties' summary of the case specifies that Defendant "terminated" the franchise after Plaintiffs failed two mystery shops, and then failed to cure by achieving a passing score on the third consecutive inspection.  (JS at 1-2.)

The PMPA applies the good faith and normal course of business standard to declining to renew a franchise agreement.  The standard applies to a decision to non-renew based on the "failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if . . . such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business."  15 U.S.C. § 2802(b)(3)(A)(i); see Rosedale Plaza Grp., LLC v. BP W. Coast Prod. LLC, 665 F. Supp. 2d 1118, 1134 (E.D. Cal. 2009) ("For Section 2802(b)(3)(A) to provide BP with an affirmative defense, BP must prove that its decision to change the franchise terms was made (i) in good faith and in the normal course of business, and (ii) the changes were not made for the purpose of preventing the renewal of the franchise relationship.").  The good faith and normal course of business standard also applies to nonrenewal as follows:

> **(D)** In the case of any franchise entered into prior to June 19, 1978, (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if--
>
> **(i)** such determination is--
>
> **(I)** to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,
>
> **(II)** to materially alter, add to, or replace such premises,
>
> **(III)** to sell such premises, or
>
> **(IV)** that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee;

15 U.S.C. § 2802(b)(3)(D)(i)(I-IV); see also BP W. Coast Prod. LLC v. May, 447 F.3d at 663.

As for termination of a franchise, the PMPA requires a "determination . . . in good faith

17

and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located."  15 U.S.C. § 2802(b)(2)(E); see Santiago-Sepulveda v. Esso Standard Oil Co. (Puerto Rico), 860 F. Supp. 2d 131, 144 (D.P.R. 2012) ("The market withdrawal provision of the PMPA permits termination of a franchise where the franchisor (1) determines 'in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area.' ") (quoting 15 U.S.C. § 2802(b)(2)(E); Beck Oil Co. v. Texaco Ref. & Mktg., Inc., 25 F.3d 559, 559–60 (7th Cir. 1994) (determining whether "Defendant's determination to withdraw was made in good faith and in the normal course of business, as required by 2802(b)(2)(E).").

The standard of "good faith and in the normal course of business," does not appear elsewhere in this section of the statute encompassing grounds and procedures for termination and renewal.  See 15 U.S.C. § 2802.  Rather, aside from utilizing the good faith and normal course of business standard into termination for withdrawing from the geographic area, 15 U.S.C. § 2802(b)(2)(E), the statute expressly provides the following standards for termination (and nonrenewal) of a franchise agreement, which appear to be applicable to the termination at hand in this case:

> **(2)** For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:
>
> **(A)** A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure-- . . .
>
> **(B)** A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise,

15 U.S.C. § 2802(b)(2)(A)-(B).  Thus, the normal standards for termination, aside from geographic terminations, include: (A) a failure to abide by any provision that is both reasonable and of material significance to the franchise relationship; and (B) a failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise agreement.

The Court did not find any caselaw that would suggest the good faith and normal course

18

of business standard is to be implicitly read into the relevant termination provision.  Rather, the Court finds support for the proposition that the exclusion of the standard from the relevant subsection evidences that Congress did not intend for such standards to apply to that termination provision.  See Esquivel v. Exxon Co., U.S.A., 700 F. Supp. 890, 895 (W.D. Tex. 1988) ("Because § 2802 does not apply to the nonrenewal of a trial franchise, 15 U.S.C. § 2803(a)(1), there is no express requirement that the determination to nonrenew be made 'in good faith and in the normal course of business' . . . [and if] the Court were to impose such a requirement, it would be in direct contravention of Congress' intent that there be no such requirement."); BSD, Inc. v. Equilon Enterprises, LLC, No. C 10-05223 SBA, 2013 WL 942605, at *15 (N.D. Cal. Mar. 11, 2013) ("To the extent Youstine argues that Equilon's termination of its franchise was not made in good faith and  in  the normal course  of business in  violation  of  § 2802(b)(3)(D)  because the termination was a pretext to deprive Youstine of its statutory right . . . the Court rejects this argument  [as]  Section  2802(b)(3)(D)  concerns  'grounds  for  nonrenewal  of  a  franchise relationship[,]' [and] [t]his case does not involve the nonrenewal of Youstine's franchise [but] [i]nstead Youstine terminated the franchise under § 2802(b)(2)(C) and § 2802(c)(8) for 'failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled.' "); BP W. Coast Prod. LLC v. Greene, 318 F. Supp. 2d 987, 996 (E.D. Cal. 2004), aff'd, 178 F. App'x 706 (9th Cir. 2006) ("[A]bsent a requirement that the court must also review the bidding process in determining good faith and in the normal course of business, the court is not inclined to add this requirement.  Section 2802(b)(3)(D) only requires that the 'determination' to sell a facility be 'made by the franchisor in good faith and in the normal course of business.' ").

For the reasons explained herein, the Court does not find Plaintiffs have demonstrated the discovery is relevant or necessary to the claims and defenses in this action.  See Dobson v. Twin City Fire Ins. Co., No. SACV 11-0192-DOC, 2011 WL 6288103, at *3 (C.D. Cal. Dec. 14, 2011) ("Plaintiffs fail to explain how this information is necessary to prepare the case for trial.  Thus, the Court does not reach whether injury to Defendants caused by disclosure outweighs Plaintiffs' need for the information.").

1   The Court does not find Plaintiffs have demonstrated the discovery is relevant or
2   necessary to determine whether the disputed term in the contract between Plaintiffs and
3   Defendant is material and reasonable, nor to determine whether there was a failure by the
4   Plaintiffs to exert good faith efforts to carry out the provisions of the franchise.   15 U.S.C. §
5   2802(b)(2)(A)-(B).   The Court does not find support for Plaintiff's proposition that Defendant
6   bears the burden to prove the termination was in good faith and in the normal course of business.
7   Nonetheless, even if Defendant was required to prove such, the Court finds Plaintiffs have failed
8   to demonstrate that the discovery at issue is relevant or necessary to prove good faith or that it
9   was taken in the normal course of business, given the type of discovery sought, and given the
10   standards for good faith and normal course of business that the Court excerpts herein.

11   Plaintiffs argue they require discovery of the Trademark License Agreement and related
12   documentation of the agreement between Boyett and P66, because the information currently made
13   available, including the Franchise Agreement, the statutorily required franchise disclosure
14   statement, and the imaging standard materials, do not expressly state that "three failed mystery
15   shopper inspections would be considered by Boyett to be a terminable offense."   (JS at 2.)
16   Plaintiffs thus argue the agreement between Plaintiffs and Defendant and associated documents
17   did not contain this material provision.   The Court now turns to review the portions of the
18   Franchise Agreement that the Court believes the parties intended to highlight, and that are
19   relevant to this argument.

20   Section 7 of the Franchise Agreement is entitled "**OPERATING STANDARDS.**"   (ECF
21   No. 36-1 at 7.)   Section 7(b) is entitled "**Brand Standards.**"   (Id.)   Section 7(b)(ix), which the
22   parties agree is the relevant provision, provides that:

23           ix.   Participation in Programs.   Buyer shall, at
        Buyer's sole cost and expense, participate in, attend and complete
24           Seller and Licensor conducted or sponsored meetings, conferences,
        training programs, image evaluation programs, "mystery" or shop
25           audit programs, or any other similar program conducted or
        sponsored by Seller and Licensor.   If Buyer (1) violates the Brand
26           Standards or Imaging Standards; (2) violates any standards and
        guidelines related to the Business and established by Licensor from
27           time to time ("Licensor Standards"); or (3) receives a substandard
        score with respect to any standard or criterion on any program
28           conducted or sponsored by Seller or Licensor (any such violation or

deficiency referred to as a "Deficiency"), Buyer shall immediately correct each violation or Deficiency to bring the Business and/or Premises into full compliance with such standards or programs.  If Buyer fails to correct any violation or Deficiency within ten (10) days after Buyer's receipt of written notice of such violation or Deficiency, Seller shall have the right, but not the obligation, in Seller's sole discretion, to correct any such violation or Deficiency at Buyer's sole cost and expense.  Buyer's failure to comply with the terms of this subsection shall be deemed a material breach of this Agreement.

(Id. at 9.)

Thus, the Franchise Agreement does notify Plaintiffs of the requirement to potentially participate in a "mystery" or shop audit program.  Plaintiffs are correct this provision does not specify that three failures will result in termination.  However, the subsection does notify Plaintiffs that a deficiency must be corrected within ten (10) days, and that a failure to comply with the terms of the subsection shall be deemed a material breach of the Franchise Agreement.

Defendant states the termination was supported by the rights of termination provisions in the contract.  Specifically, it provides that the Seller may, in its sole and absolute discretion, terminate the agreement: "For any of the following reasons, each of which shall be considered an 'Event of Default' . . . [(1) the] Buyer's failure to comply with any provision of this Agreement, which provision is both reasonable and of material significance to the relationship under this Agreement, including without limitation, not complying with the Operation Standards or Insurance requirements; [or 2 the] Buyer's failure to exert good faith efforts to carry out the provisions of this Agreement."  (Franchise Agreement, Sect. 19(b)(iii)(1-2), ECF No. 36-1 at 17.)

This language is consistent with the standards under the PMPA that the Court believes are relevant to the termination here.  See 15 U.S.C. § 2802(b)(2)(A)-(B).  Additionally, Section 19(b)(ii) of the Franchise Agreement pertaining to Seller's termination rights incorporates the good faith and normal course of business standard in deciding to withdraw from a regional market, stating: "Seller makes a good faith determination in the normal course of business to withdraw from marketing of motor fuel through retail outlets in the relevant geographic market area in which the Premises is located."  (ECF No. 36-1 at 17.)  Thus, the Franchise Agreement reflects consistently with the differing standards for various forms of termination and renewal

1  under the PMPA that the Court discussed above.

2       In this order, the Court does not definitely make determinations as to the appropriate legal

3  standards applicable to this action.   However, the Court finds for purposes of this discovery

4  dispute that the PMPA does not appear to apply the good faith and normal course of business

5  standard to the termination at hand, or at least it has not been demonstrated to the Court for

6  purposes of this order otherwise.   At end, that determination is not the goal of this order, and the

7  standards likely have overlapping components.   See Esquivel, 700 F. Supp. at 895 ("The test for

8  determining whether a franchiser has acted in good faith and in the normal course of business

9  may be useful, however, in determining whether Defendant's decision to nonrenew was a proper

10  exercise of its good faith business judgment.").

11       The Court ultimately concludes Plaintiffs have not demonstrated relevancy or need for the

12  information under any standard applicable to trade secrets and confidential information.   The

13  Court finds the Franchise Agreement's provisions discussed herein, the discovery concerning the

14  mystery shop program's web portal and imaging standards, discovery of communications

15  regarding the actual decision to terminate, depositions of the decision-makers, and other sources

16  of information, provide a sufficient basis to adjudicate the claims and defenses in this action.

17  Based on the type of discovery sought, the relevant legal standards, and the terms of the contract

18  that are at the heart of the dispute for the trier of fact to base its decision on, the Court finds

19  Plaintiffs have failed to show the Trademark License Agreement or other related documents

20  pertaining to the agreements between Defendant and P66, that are not agreements between

21  Defendant and Plaintiffs that are the subject of this action, are relevant or necessary to prepare for

22  trial.   The Court does not see a clear reason why a trier of fact would not be able to view the

23  Franchise Agreement terms, and the relevant portal information and other documentation relating

24  to the mystery shop audit program, and make a determination whether the contract term was clear

25  enough to be material and reasonable, or weigh Plaintiffs' good faith efforts.   Specifically, for

26  example, pursuant to the termination terms themselves, the contract states that the provision must

27  be "reasonable," in addition to being of "material significance."   (Sect 19(b)(iii)(1).)

28  Additionally, the next potential ground for termination provides that seller may terminate for

Plaintiffs' "failure to exert good faith efforts to carry out the provisions of this Agreement." (Sect. 19(b)(iii)(2).) Thus, the trier of fact can determine whether the term is reasonable, including whether the term is vague or unenforceable or it is unreasonable to attach a number of 3 mystery shop violations when the number 3 is not explicitly mentioned in the Franchise Agreement or Defendant's arguments concerning failure to correct, or whether Plaintiffs exerted good faith efforts to comply with the provisions, which can include similar arguments concerning the vagueness or ability to comply with Section 7(b)(ix).

Further and again, even if the good faith and normal course of business standards were applicable, Plaintiffs have not demonstrated relevancy or a need for such discovery under these standards:

> The PMPA's good faith requirement looks to whether a franchisor's decision is a "sham determination" used as an artifice to terminate or nonrenew a franchise. *Beck Oil Co. v. Texaco Refining & Marketing, Inc.,* 25 F.3d 559, 561–62 (7th Cir.1994); *Ajir v. Exxon Corp.,* 1995 WL 261411, *2 (N.D.Cal.1995). "The good faith requirement looks to whether the franchisor's actions are designed to conceal selective discrimination against individual franchises." *Kaabipour,* 177 F.3d at 767. When determining whether a decision is in good faith, the court must keep in mind that Congress did not intend "judicial second-guessing of the economic decisions of franchisors." *Svela v. Union Oil Co. of Calif.,* 807 F.2d 1494, 1501 (9th Cir.1987). The court is not to review the objective reasonableness of the franchisor's actions or substitute the court's judgment for that of the franchisor in deciding whether to sell the a facility. *Coast Village, Inc. v. Equilon Enterprises, LLC,* 163 F.Supp.2d 1136, 1175 (C.D.Cal.2001). The test for determining good faith is subjective, and the court should look to the franchisor's intent rather than the effect of the franchisor's actions. *Svela,* 807 F.2d at 1501. In determining a franchisor's motive, the court may only review the franchisor's process and proven motive in deciding to sell the Facility. *See Coast Village, Inc. v. Equilon Enterprises, LLC,* 163 F.Supp.2d 1136, 1175 (C.D.Cal.2001). As long as the franchisor did not have discriminatory motive and there is no evidence the reasons given are not a pretext disguising an improper purpose, the court should find good faith. *Kaabipour,* 177 F.3d at 767; *Beck Oil,* 25 F.3d at 562; *Massey v. Exxon Corp.,* 942 F.2d 340, 344 (6th Cir.1991).

> A franchisor meets the "normal course of business" requirement if the determination was the result of the franchisor's normal decision making process. *Beck Oil,* 25 F.3d at 562. "While Congress intended the good faith test to prevent franchisors from shielding their decisions with artifice, the normal course of business element examines whether the franchisor made the choice through its usual decision-making process." *Sandlin v. Texaco Refining and*

*Marketing Inc.,* 900 F.2d 1479, 1481 (10th Cir.1990).

Greene, 318 F. Supp. 2d 987, 995–96.  While there is an argument these considerations could make discovery into other franchisees relevant, as discussed in the next section, Plaintiffs have not demonstrated why a trier of fact would not be able to determine whether the decision to terminate was based in good faith and the normal course of business by referring to the Franchise Agreement terms, the alleged instances of non-compliance with the image standards, the evidence concerning the actual violations and the mystery shop occurrences, and communications concerning the mystery shop violations (internal within Boyett, with the shopper, and between the parties).

Additionally, even if Plaintiffs could demonstrate some need for trial, the Court would find that given the amount of ways it appears Plaintiffs can utilize various forms of evidence to address the claims and defenses, the injury that disclosure might cause outweighs the demonstrated need for the information.  Nat'l Acad. of Recording Arts & Scis., 256 F.R.D. at 681–82; Hartley Pen Co., 287 F.2d at 331; Upjohn Co., 151 F.R.D. at 358.[5]

Finally, given the reasoning above, the Court does not find the issue of the franchise disclosure statement to be determinative to the discovery at dispute here.  Further, the Court finds

---

[5] Further, while the Court found above that the issues underlying this discovery dispute were sufficiently preserved for consideration by the Court, again, the scheduling order directed the parties to file a discovery motion within a reasonable amount of time of discovery of the issue, and the June 30, 2022 deadline is really meant to be the outer limit for filing discovery motions that should relate to discovery requests made near the expiration of the nonexpert discovery deadline.  This is because the parties need to front-load broad and far-reaching discovery requests so that all information can be obtained, and disputes resolved, in time for follow-up discovery, whether in the form of depositions based on the document and interrogatory responses, or further document requests.  In this case, Rule 26 disclosure was to occur no later than October 8, 2021.  (ECF No. 18)  Expanding discovery into the agreements between Boyett and P66 will necessarily expand the scope of and need for follow-up discovery, which will likely then divert into additional discovery into P66, its employees and internal documents or other discovery to interpret and analyze the meaning of the agreement.  While the timeliness of bringing this discovery dispute concerning these forms of discovery at this point in litigation, after first serving this discovery in February of 2022, was not foreclosed given the preservation of the issues, there is necessarily some consideration of the Rule 26 balancing factors when the Court considers expanding the scope of discovery so significantly at this stage of the litigation.  Thus, the Court would find relevance outweighed under the Rule 26(b)(1) balancing factors, as well as good cause for a protective order under Rule 26(c).  See Fed. R. Civ. P. 26(b)(1) (allowing relevant discovery "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."); Fed. R. Civ. P. 26(c)(1) (annoyance, embarrassment, oppression, or undue burden or expense are grounds for the issuance of a protective order).  As discussed in the next section, the Court finds Rule 26 considerations also weigh against the discovery in Identified Issue Number 2, and the Court incorporates this consideration of the issue of expanding discovery into the following section as well, given the significant expansion of discovery that would result from allowing discovery into various third-party franchisee operations and their events of default relating to the mystery shop program.

1    no reason why a trier of fact would not be able to make a determination regarding compliance

2    with the franchise disclosure laws without the Trademark License Agreement and associated

3    documents sought.  The Court further notes that Exhibit B to the Franchise Agreement appears to

4    be the information disclosure form pursuant to California Corporations Code § 31100 *et seq.*

5    (ECF No. 36-1 at 31.)  The attachment specifies that: "[t]he Agreement that provides the typical

6    terms and conditions of the Company's franchise relationship is attached hereto and made a part

7    of this Information Disclosure RE Franchise Registration Exemption.   THE AGREEMENT

8    SHOULD BE READ CAREFULLY BEFORE YOU SIGN IT." (Id.)  The document additionally

9    states that: "[t]he Company may terminate or refuse to renew the Agreement according to the

10   terms and conditions set forth in accordance with the Petroleum Marketing Practices Act, 15

11   U.S.C. § 2801, et seq. ("Act"), as that Act may be amended from time to time, upon the terms and

12   conditions of the attached Agreement, or any other applicable law.  Franchisee may terminate or

13   refuse to renew the franchise at any time without cause if a right to do so is provided in the

14   attached Agreement, subject to any minimal notice and other requirements contained in the

15   Agreement and applicable law." (Id.)

16          Accordingly, for all of the above discussed reasons, the Court rules in favor of Defendant

17   as to first issue identified by the parties in their joint briefing, and finds Plaintiffs are not entitled

18   to discovery into the Trademark License Agreement between Defendant and P66, nor associated

19   agreements or documents that are confidential trade secrets between Defendant and P66.

20          **C.      Identified Issue 2: Documents and Information Pertaining to Other
                     Franchisees Default or Termination for Failed Image Standards**
21

22                  1.     Plaintiffs' Position

23          These discovery requests Defendant to provide the names and contact information for

24   every one of its franchisees who have been sent notices of default and/or notices of termination

25   for not earning passing scores for the mystery shop inspections, as well as the production of the

26   notices of default and notices of termination.  (JS at 3.)  Plaintiff argues the consequences (or lack

27   thereof) to other franchisees for not passing such inspections goes to the issue of whether the

28   terms of the franchise relationship that Defendant claims were breached were actually material, as

well as the issue of whether Defendant's decision to terminate the franchise was done in good faith and in the normal course of business.  Plaintiffs further proffer that identifying these people or entities does not invade third party privacy rights, as Plaintiffs again are willing to stipulate to a protective order.

2. <u>Defendant's Position</u>

In response, Defendant proffers Plaintiffs are not only seeking the identity of other franchisees, but want names of those who have been sent notices of default or termination for failing to earn passing scores, however, this is information is potentially damaging to their businesses and the information is supposed to remain confidential.  (JS 4.)  Defendant also argues the information is not relevant to any claim or defense, as each default and termination is based on all of the relevant facts and circumstances and scores, and each situation is different. Specifically for example in this case, Defendant emphasizes there has been a long and continued history of failing scores by Plaintiffs; that Plaintiffs were warned multiple times regarding their failing scores prior to the termination; that P66 provides specific brand image standards that must be met by 76 branded service stations; and one dealer's default and or termination has no correlation to another dealer's default and/or termination.  (JS 4.)

Defendant further highlights that the Franchise Agreement itself expressly states that the inspection program compliance requirement is material, and proffers the only relevant inquiry here is what were the standards Plaintiffs were required to meet, and whether Plaintiffs failed to meet those standards.  (JS 4.)  Finally, Defendant also notes that the requests are overbroad because Defendant carries multiple fuel brands and the Franchise Agreement only involves the P66 brand, which carries its own specific brand image and inspection requirements.

3. <u>The Court's Ruling</u>

The Court finds the information sought is not directly relevant to the claims and defenses in this action, though as noted above, the Court can see arguments for potential relevance to the discovery into these franchisees under the good faith and normal course of business standard.  <u>See</u> <u>Greene</u>, 318 F. Supp. 2d 987, 995–96 (good faith requirement looks to whether the franchisor's actions are designed to conceal selective discrimination against individual franchise).  But again,

1    it does not appear that is the relevant standard, as discussed above.

2         Under any standard, the Court would find any relevance outweighed under the Rule

3    26(b)(1) balancing factors, as well as good cause for a protective order under Rule 26(c), for

4    much of the same reasons discussed in the previous Section pertaining to Identified Issue Number

5    One.  See Fed. R. Civ. P. 26(b)(1) (allowing relevant discovery "proportional to the needs of the

6    case, considering the importance of the issues at stake in the action, the amount in controversy,

7    the parties' relative access to relevant information, the parties' resources, the importance of the

8    discovery in resolving the issues, and whether the burden or expense of the proposed discovery

9    outweighs its likely benefit."); Fed. R. Civ. P. 26(c)(1) (annoyance, embarrassment, oppression,

10   or undue burden or expense are grounds for the issuance of a protective order); Dart Industries,

11   649 F.2d at 649 (discovery more limited to protect third parties from harassment, inconvenience,

12   or disclosure of confidential documents).

13        Recognizing a somewhat different standard given Defendant does not argue this

14   information is a trade secret, though privacy interests may overlap with the confidentiality

15   consideration, the Court again finds in favor of Defendant.  The Court finds Plaintiffs have not

16   sufficiently demonstrated the information sought is relevant to the claims and defenses in this

17   action.  The trier of fact can consider the Franchise Agreement terms, the alleged instances of

18   non-compliance with the image standards, the evidence concerning the actual violations and the

19   mystery shop occurrences, including communications and documentation concerning the mystery

20   shop violations, as well as internal general practices and procedures (or lack thereof), all in

21   relation to witness and deposition testimony.  Any potential relevancy is outweighed by the

22   availability of this evidence, as well as other considerations expressed throughout this order.  Fed.

23   R. Civ. P. 26(b)(1), (c)(1).

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

**IV.**

**ORDER**

Accordingly, based on consideration of the facts and arguments presented in the parties' joint statement, the matters discussed during the informal conference, and the supplemental briefing and the exhibits attached thereto, IT IS HEREBY ORDERED that:

1. The Court rules in favor of Defendant as to the two identified substantive issues in the parties' joint statement of discovery dispute;

2. Plaintiffs' request to compel Defendant to produce the Trademark License Agreements/wholesale marketing agreement and addendums thereto between Boyett and P66 is DENIED; and

3. Plaintiffs' request to compel Defendant to identify all other franchisees of Boyett's who have received notices of default or termination for failed image standards and to produce the notices of default and notices of termination is DENIED.

IT IS SO ORDERED.

Dated:   **September 12, 2022**

_____
UNITED STATES MAGISTRATE JUDGE

28